IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

MICHAEL SHADBOLT )
and MARSH SHADBOLT, )
)
      Plaintiffs, ) TC-MD 180334N
)
    v. )
)
DEPARTMENT OF REVENUE, )
State of Oregon, )
)
      Defendant. ) **DECISION**

Plaintiffs appealed Defendant's Notices of Assessment, dated July 18, 2018, for the 2014

and 2015 tax years. A trial was held on July 31, 2019, in the courtroom of the Oregon Tax

Court. Robert L. Armstrong (Armstrong), CPA, appeared on behalf of Plaintiffs. Celeste

Shadbolt Bonniksen (Bonniksen) and Plaintiff Marsh Shadbolt (Shadbolt) testified on behalf of

Plaintiffs. Bruce McDonald (McDonald), Tax Auditor, appeared on behalf of Defendant.

Plaintiffs' Exhibits 1 to 158 and Defendant's Exhibits A to H were received without objection.

I. STATEMENT OF FACTS

Plaintiffs are the sole shareholders of the Continental Shelf, dba Cherry Country, an S

Corporation, engaged in cherry processing. Michael J. Shadbolt is the proprietor of the Shadbolt

Orchard LLC, which owns the farm property upon which Cherry Country conducts its

operations. (*See* Def's Ex A at 9, B at 10.) Plaintiffs reported items of income and expense for

the Shadbolt Orchard on their 2014 and 2015 Schedules C.[1] (*See* Ptfs' Exs 61, 63.) Defendant

adjusted Plaintiffs' 2014 and 2015 personal income tax returns resulting in additional taxes due

for each year. (*See* Def's Ex A at 23, B at 17.) Plaintiffs raised three issues on appeal: 1)

---

[1] No income was reported for either year and the only expense reported was interest.

whether Plaintiffs presented sufficient evidence of Cherry Country's suspended losses going into the 2008 tax year; 2) whether Plaintiffs received a taxable distribution from Cherry Country for the 2015 tax year based on its payments to construct a dwelling on the farm property; and 3) whether Plaintiffs may deduct interest on a line of credit associated with their farm property for the 2014 and 2015 tax years.

A.      *Cherry Country's Business Operations and Bookkeeping*

Bonniksen testified that she is the general manager of Cherry Country; she keeps the books, oversees operations, manages payroll, establishes loans, pays bills, and invoices customers. She has performed those duties since 2002. Bonniksen testified that she recorded expenses in QuickBooks based on checks and debit transactions. She used general journal entries to reflect shareholder contributions; for example, when Plaintiffs paid company expenses on a personal credit card. Bonniksen testified that, at the time she made entries in QuickBooks, receipts were available, and she reviewed them. Shadbolt testified that she is the production manager, secretary, and assistant to Bonniksen — a "jack of all trades." She explained that Cherry Country is a small company and she does what needs to be done. Shadbolt confirmed that Bonniksen required her to submit receipts for expenses paid on behalf of the corporation.

B.      *Suspended Losses Incurred Prior to 2008*

Plaintiffs claimed a suspended loss of $45,991 going into the 2014 tax year. (Ptfs' Ex 3.) That was based in part on a suspended loss of $38,185 carried over into 2008. (*See* Def's Ex D at 1 (basis summary 2008 through 2015).) Defendant disallowed the suspended loss going into 2008, resulting in a suspended loss going into 2014 of $12,864. (*See* Def's Ex G at 4 (identifying amount of suspended loss disallowed; McDonald updated his calculations at trial).) McDonald explained that he disallowed the suspended loss of $38,185 carried forward into 2008

because Armstrong was not Plaintiffs' CPA prior to 2008 and the basis worksheet simply reported the amount as a lump sum with no separate detail tracking shareholder contributions and distributions as in subsequent years. (*See* Def's Ex D at 1 (basis summary 2008-2015).)

C.      *Distribution in 2015 Tax Year*

In late 2014, Cherry Country received a loan of $144,000 from the United States Department of Agriculture (USDA) to place a manufactured structure on the farm property. The new home is Plaintiffs' personal residence from which they conduct the farming operation. Bonniksen testified that the USDA was aware that the loan was for a personal residence; there were no "smoke and mirrors." Plaintiffs, in their individual capacities, and Shadbolt Orchard joined in executing the loan by pledging the farm property as collateral. (*See* Ptfs' Exs 93, 98-99[2], Def's Ex E at 2, 7.) Plaintiffs and the Shadbolt Orchard are identified as the owners of the farm property in the deed recorded by Ticor Title and transferred to Polk County. (*See* Def's Ex E at 18.)

The loan was made to Cherry Country due to USDA regulations that prevented Plaintiffs from adding a second bank account to their existing account with the USDA. (*See* Ptfs' Ex 65, Def's Ex E at 2 (letter from USDA loan officer so stating).[3]) Bonniksen testified that Cherry Country had previously received loans from the USDA for farm equipment and operations. In

---

[2] The Security Agreement identifies items of farm equipment as collateral in addition to the farm property. (Ptfs' Ex 99.)

[3] The Farm Loan Manager wrote that the Farm Service Agency (FSA) "first became involved with [Plaintiffs] in 2006. They requested an equipment loan to aid in the expansion of their company, * * * FSA provided an equipment loan, an operating loan, and a loan to refinance debt." (Ptfs' Ex 65.) He further wrote that the "FSA makes all money transfers via electronic funds transfer. FSA links with only one checking account provided by the borrower. In this case all of our funds transfers were made to the checking account for Continental Shelf, LLC. [Plaintiffs] make the payments for their farm ownership loan from their personal checking account." (*Id.*)

2014, Cherry Country was still paying off two USDA loans, one from 2008 and a second from 2013. (*See* Def's Ex E at 20-21 (USDA statements showing loan balances as of 2015 on the operating and equipment loans).)

The USDA loan proceeds were not paid in a lump sum to Cherry Country. Bonniksen testified that Plaintiffs were required to substantiate expenses to the USDA. Plaintiffs sent invoices and bills to the USDA, which then transferred the funds to Cherry Country. (*See* Ptfs' Exs 66-90[4]; Def's Ex F at 1-3.) Bonniksen testified that Cherry Country typically paid the contractors directly upon receiving funds from the USDA due to the contractors' time demands. (*See, e.g.,* Ex F at 1-3 (sales agreement with Clayton homes for $99,838 and with 3 Construction LLC for $45,214[5]).) Bonniksen and Marsh each testified that Plaintiffs provided their own funds to supplement the loan proceeds. (*See also* Ptfs' Exs 101-102 (timeline of home project showing costs totaling more than $20,000 in 2013).)

With respect to the corporate books, Bonniksen testified that she recorded the home loan funds transferred from the USDA as shareholder contributions and made off-setting distributions when funds were used to pay contractors. (*See* Def's Ex H at 22 (reporting distribution of $103,235).) Bonniksen testified that she did not use the asset and liability accounts because the residence is not a corporate asset, it is personal property. She testified that the USDA operating and equipment loans are listed as loans on the corporate books.[6] Cherry Country makes

---

[4] As of February 19, 2015, USDA FSA had made five electronic check transfers in 2014 and six in 2015 totaling $138,156 with $5,844 remaining undisbursed. (Ptfs' Ex 76.)

[5] The sales agreement with Clayton Homes, dated April 18, 2013, for $99,838 lists the buyers as "Mike + Marsh Shadbolt." (Def's Ex F at 1.) The invoice from 3A Construction LLC for $45,214 dated May 16, 2013, is to "Mr. & Mrs. Shadbolt, Cherry Country." (*Id.* at 3.)

[6] The corporate balance sheet shows a note or mortgage of $144,983 at the start of 2014. (*See* Def's Ex H at 4, line 20). Bonniksen testified that that total reflected the two business operating loans from the USDA in 2008 and 2013. (*See* Def's Ex E at 4, 20-21.)

payments on the USDA operating and equipment loans, but has never made payments on the home loan; those are all made personally by Plaintiffs. (*See* Ex 98 (stating $645 due each month), Exs 113-158 (personal bank account statements showing payments on home loan and USDA statements confirming receipt).)

McDonald accepted that Plaintiffs received a distribution of $103,235 in 2015 but determined their basis from contributions was only $18,188 based on Plaintiffs' payment of corporate expenses with personal funds, resulting in a taxable distribution of $85,047.[7] (*See* Def's Ex B at 16, C at 1, D at 1-2, Ex H at 22.) McDonald disagreed that the USDA home loan created shareholder basis, though he agreed that any payments Plaintiffs made personally on the USDA loan created basis.

D.      *Interest on Farm Property Line of Credit*

For the 2014 and 2015 tax years, Plaintiffs deducted interest on their Schedules C: $1,758 in 2014 and $1,467 in 2015. (*See* Ptfs' Exs 61, 63.[8]) Shadbolt testified that the interest was on a line of credit from Citizens Bank, for which the farm property was collateral. (*See* Ptfs' Ex 62.) She testified that the proceeds from that loan were used for both business operating expenses and to complete site improvements at the farm property. In Defendant's view, the site improvements were personal so Plaintiffs should have allocated the interest between business and personal.

## II.  ANALYSIS

The issues presented are: 1) whether Plaintiffs may carry over a suspended loss of $38,185 incurred prior to the 2008 tax year; 2) whether Plaintiffs received a taxable distribution

---

[7] Plaintiffs reported total contributions of $38,895 in 2014 and $115,445 in 2015. (*See* Ptfs' Ex 4.) Bonniksen testified that, other than the USDA loan, those contributions were based on Plaintiffs' payment of corporate expenses from personal accounts.

[8] Interest is the only expense listed on either Schedule C.

from Cherry Country for the 2015 tax year based on its payments to construct a dwelling on the farm property; and 3) whether Plaintiffs may deduct interest on a line of credit associated with their farm property for the 2014 and 2015 tax years.

The Oregon Legislature intended to "[m]ake the Oregon personal income tax law identical in effect to the provisions of the Internal Revenue Code [IRC] relating to the measurement of taxable income of individuals, estates and trusts, modified as necessary by the state's jurisdiction to tax and the revenue needs of the state[.]" ORS 316.007.[9] "Any term used in this chapter has the same meaning as when used in a comparable context in the laws of the United States relating to federal income taxes, unless a different meaning is clearly required or the term is specifically defined in this chapter." ORS 316.012. Generally, "the taxable income of an S corporation shall be computed pursuant to section 1363(b) of the [IRC], with the modifications, additions and subtractions provided in this chapter [ORS 314] and ORS chapter 316." ORS 314.732(2)(a). The shareholder's pro rata share of the corporation's separately stated items of income, loss, or deduction are determined as under IRC section 1366, subject to the modifications, additions, and subtractions provided under ORS chapters 314 and 316. ORS 314.734(1). "Each item of shareholder income, gain, loss or deduction has the same character for a shareholder under this chapter and ORS chapter 316 as it has for federal income tax purposes." ORS 314.734(2).

Deductions are "a matter of legislative grace" and taxpayers bear the burden of proving their entitlement to the deductions claimed. *INDOPCO, Inc. v. Comm'r*, 503 US 79, 84, 112 S Ct 1039, 117 L Ed 2d 226 (1992). The burden of proof by a preponderance of the evidence falls upon the party seeking affirmative relief; in this case, Plaintiffs. ORS 305.427. "Preponderance

---

[9] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). In an appeal from a notice of assessment issued by Defendant, the court has jurisdiction to determine the correct amount of the deficiency, even if on "grounds other or different from those asserted by" Defendant. ORS 305.575.

A.  *Suspended Losses Incurred Prior to 2008*

Generally, items of income or loss of an S corporation pass through to its shareholders. IRC § 1366(a). "An S corporation must report, and a shareholder is required to take into account in the shareholder's return, the shareholder's pro rata share, whether or not distributed, of the S corporation's items of income, loss, deduction or credit * * *." Treas Reg § 1.1366-1(a). The shareholder may not deduct losses that exceed the sum of the shareholder's adjusted bases in the stock and debt of the corporation. *See* IRC § 1366(d)(1). "This restriction applies because the disallowed amount exceeds the shareholder's economic investment in the S corporation and, because of the limited liability accorded to S corporations, the amount does not have to be repaid. The shareholder bears the burden of establishing his or her basis." *Broz v. Comm'r*, 137 TC 46, 60 (2011). Such disallowed losses that exceed the shareholder's adjusted stock and debt bases may be carried over to succeeding tax years. *See* IRC § 1366(d)(2)(A).

Plaintiffs did not provide any of their tax returns filed for years prior to 2008, nor did they provide any underlying records used to prepare those returns. Plaintiffs' basis worksheet includes no detail from prior to 2008; rather, it reflects a lump sum loss carried into the 2008 tax year. Plaintiffs have failed to meet their burden of proof with respect to their suspended loss of $38,185 carried over into 2008.

B.      *Taxable Distribution Based on USDA Home Loan*

"Distributions are defined as amounts paid by a corporation to a shareholder in his or her capacity as a shareholder from the earnings and profits of the corporation." *AD&R Inc. v. Dept. of Rev.*, TC-MD 060633D, WL 900761 at *7 (Or Tax M Div Mar 20, 2007), citing IRC § 301(c)(1).[10]  If an S corporation with no accumulated earnings and profits makes a distribution in excess of adjusted basis, "such excess shall be treated as gain from the sale or exchange of property."  IRC § 1368(b)(2).[11]

A shareholder's stock basis "turns on the corporation's income-loss performance in a given year as well as on whether the shareholder has made any capital contributions to the corporation." *Maloof v. Comm'r*, 456 F3d 645, 648 (2006); *see also* IRC § 1367(a) (listing items that increase a shareholder's stock basis).  A shareholder acquires debt basis if the shareholder makes a loan to the corporation.  "The indebtedness must run directly from the S corporation to the shareholder and the shareholder must make an actual economic outlay for debt basis to arise." *Broz*, 137 TC at 60; *see also* IRC § 1366(d)(1)(B) (limiting losses to "the shareholder's adjusted basis of any indebtedness of the S corporation to the shareholder").)

Defendant determined that Plaintiffs received a taxable distribution of $85,047 based on Cherry Country's payments to contractors to construct a personal dwelling on the farm property. Defendant declined to accept Plaintiffs' claimed basis increase in Cherry Country due to the USDA home loan.  The court begins by examining whether Plaintiffs increased their basis in

---

[10] IRC section 1368(a), which governs distributions by S corporations to shareholders, expressly references IRC section 301(c), which provides rules for distributions and dividends by corporations.

[11] "S corporations created after 1982 that maintain S status continually from their inception and do not inherit earnings and profits from another corporation by virtue of a corporate adjustment under § 1371(c)(2)" have no accumulated earnings and profits and are, therefore, governed by § 1368(b). *Bittker and Eustice*, Federal Income Taxation of Corporations & Shareholders, ¶ 6.07[2] S Corporations with No Accumulated Earnings and Profits.

Cherry Country either by contributing the loan proceeds to Cherry Country or by guaranteeing the loan. Next, the court examines whether Cherry Country's payment of expenses related to constructing Plaintiffs' personal residence was a distribution. Finally, the court considers Plaintiffs' argument that they assumed Cherry Country's liability to the USDA, thereby reducing the amount of the distribution. (*See* Ptfs' Ex 64, citing IRC § 357(d), Treas Reg § 1.301-1(g).)

1. *Basis increase due to shareholder guarantee of loan*

As noted above, a shareholder's stock or debt basis is only increased where the shareholder makes an "actual economic outlay." *See Maloof*, 456 F3d at 649-650 (noting that every federal circuit court to consider the issue has upheld the use of that standard). To increase basis, "there must have occurred some transaction which when fully consummated left the taxpayer poorer in a material sense." *Perry v. Comm'r*, 54 TC 1293, 1296 (1970) (internal citation omitted). Generally, a shareholder's guarantee of a loan to the corporation does not increase the shareholder's basis, nor does a security interest on a shareholder's property by itself establish an economic outlay. *See Maloof*, 456 F3d at 650. Similarly, Treasury Regulation 1.1366-2(a)(2)(ii) provides that,

> "A shareholder does not obtain basis of indebtedness in the S corporation merely by guaranteeing a loan or acting as a surety, accommodation party, or in any similar capacity relating to a loan. When a shareholder makes a payment on bona fide indebtedness of the S corporation for which the shareholder has acted as guarantor or in a similar capacity, then the shareholder may increase the shareholder's basis of indebtedness to the extent of that payment."[12]

Notwithstanding the general rule concerning shareholder guarantees, the court in *Selfe v. US* found an exception "where the facts demonstrate that, in substance, the shareholder has

---

[12] The "bona fide indebtedness" standard added to the regulation in 2014 is "effectively the same as that under the 'actual economic outlay' doctrine" because the "regulation states that 'bona fide indebtedness' is to be determined by 'general Federal tax principles[.]' " *Meruelo v. Comm'r*, 923 F3d 938, 942 (11th Cir 2019) (affirming the Tax Court, which interpreted the 2014 regulation).

borrowed funds and subsequently advanced them to her corporation." 778 F2d 769, 772-73 (11th Cir 1985). The court noted several facts supporting the taxpayer: 1) the loan officer gave deposition testimony that the bank looked primarily to taxpayer for repayment; 2) the corporation was thinly capitalized; 3) the corporation was "a fledging enterprise operated by a novice in a highly competitive field" rendering it unlikely that the bank would have advanced funds directly to the corporation; and 4) the bank had previously approved a line of credit to the taxpayer in her personal capacity based upon her pledge of stock. *Id.* at 774-75.

The court in *Selfe* looked beyond the form of the transaction to its substance to determine whether the loan was, in fact, to the taxpayer and subsequently advanced to the corporation. Generally, courts accept the form of a transaction as reflecting its substance:

> "[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not."

*Don E. Williams Co. v. Comm'r*, 429 US 569, 579-80, 97 S Ct 850, 51 L Ed 2d 48 (1977) (citation omitted).[13] However, "where the nature of a taxpayer's interest in a corporation is in issue, courts may look beyond the form of the interest and investigate the substance of the transaction." *Selfe*, 778 F2d at 774 (citations omitted); *see also Higgins v. Smith*, 308 US 473, 60 S Ct 355, 84 L Ed 406 (1940) (noting that "[t]he [g]overnment may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the

---

[13] *See also Catalano v. Comm'r*, 76 TCM (CCH) 1029 (1998) (disallowing the S corporation's deductions for yacht lease payments made to taxpayer under IRC section 274, but refusing to remove the lease payments as income to taxpayer despite taxpayer's argument that failure to do so resulted in double taxation). The court emphasized the separate existence of corporations from their shareholders and the distinction between the business of the corporation and that of its shareholders. The disallowance of the corporate expense deduction had no impact on the taxpayer's receipt of rental income on his yacht.

purposes of the tax statute"). It must be noted that the ruling in *Selfe* is an outlier largely confined to its unique facts; it "continues to stand alone as a case in which a court permitted a loan guarantee by a shareholder of an S corporation to increase the basis of his debt or stock in the corporation." *Maloof*, 456 F3d at 651.

Here, several facts support a finding that the USDA home loan was, in substance, to Plaintiffs rather than Cherry Country. First, the loan was to construct a farm dwelling, not to fund corporate operations or purchase equipment. The letter from the USDA loan officer states that the loan was made to Cherry Country due to regulations preventing the USDA from adding a second bank account for electronic funds transfers. The loan officer's letter implies that the decision to name Cherry Country rather than Plaintiffs was driven by the peculiarities of its technological capability rather than an intention to lend to Cherry Country. Second, Plaintiffs made payments on the USDA loan from their personal funds, as confirmed by their bank records and the letter from the USDA loan officer. Third, the most significant collateral pledged — the farm property — is owned by Plaintiffs rather than Cherry Country.[14] Finally, the USDA home loan is reported differently on Cherry Country's balance sheet than other loans received from the USDA; whereas other USDA loans were reported as liabilities, the USDA home loan was reported as a distribution with a matching contribution. No evidence was presented whether expenses related to the USDA home loan were reported on the corporate return or on Plaintiffs' personal return.[15] On balance, the evidence supports a finding that the USDA home loan was, in

---

[14] Some farm equipment presumably belonging to Cherry Country was also pledged as collateral, a fact that cuts somewhat against Plaintiffs.

[15] Cherry Country's returns for the 2014 and 2015 tax years reflect expenses for repairs and maintenance, interest, and "other" unspecified expenses. (Ptfs' Exs 47 at 1, 54 at 1.) Plaintiffs' 2014 Schedule A reported property taxes and home mortgage interest; their 2015 Schedule A reported only property taxes. (Def's Ex A at 8, Ex B at 5.) No further evidence concerning the specific items deducted was presented.

substance, a loan to Plaintiffs. To the extent that Plaintiffs received a distribution from Cherry County, the court concludes that a matching contribution is supported. Next, the court considers whether Plaintiffs received a distribution from Cherry Country.

2.  *Distribution where corporation pays shareholder's personal expenses*

Generally, when a corporation pays the personal expenses of its shareholder without any expectation of repayment, courts have found that the shareholder received a constructive distribution or dividend. *See, e.g., Hagaman v. Comm'r*, 958 F2d 684, 691 (6th Cir 1992) (finding taxpayers received a constructive dividend where their corporation paid for their children's homes, for their yacht, and for their legal expenses[16]); *see also Nahikian v. Comm'r*, 69 TCM (CCH) 2370 (1995) (finding taxpayer received a constructive dividend where his corporation paid to construct his personal residence and the taxpayer failed to present persuasive evidence that the distribution was intended as a loan at the time of distribution).

Where the taxpayer intends at the time of receipt to repay the corporation, courts have found the payment was not a distribution or dividend. *See Helgesen Properties, Inc. v. Comm'r*, 47 TCM (CCH) 751 (1983) (finding no constructive dividend where the corporation failed to charge the taxpayer the full amount of construction costs on a personal building). The court in *Helgesen* identified several factors to consider in determining whether taxpayer intended to repay the corporation for personal construction costs.[17] The taxpayer repaid the corporation for a

---

[16] The taxpayers in *Hagaman* had deducted those expenses on their corporate returns as "corporate operating expenses." 958 F2d at 687. The court upheld fraud penalties based on the taxpayers' "evasive scheme," including that and other actions taken by taxpayers. *Id.* at 696.

[17] Those factors are: 1) whether the taxpayer in fact paid any of the costs during or upon completion of construction, 2) whether the taxpayer was financially able to repay the corporation, 3) whether the personal project costs were treated in the same manner as the costs for projects built for others, 4) whether the taxpayer attempted to conceal records of project costs, and 5) whether the construction contract provided that the corporation was to bear the costs.

substantial portion of the direct costs and demonstrated an ability to repay the remainder based on unused mortgage proceeds. Additionally, the corporation's failure to charge the full amount was inadvertent and out of line with corporate policy and past practice. The taxpayer never attempted to conceal cost records related to the project.

"The crucial concept in a finding that there is a constructive dividend is that the corporation has conferred a benefit on the shareholder in order to distribute available earnings and profits without expectation of repayment." *Welle v. Comm'r*, 140 TC 420, 422-423 (2013) (citation and internal quotation marks omitted). In *Welle*, the court found that the taxpayer's failure to pay his corporation its typical six to seven percent profit on construction of a personal residence did not constitute a constructive dividend. *Id.* at 426-427. The taxpayer fully reimbursed his corporation for the cost of services, including overhead, so the corporation's earnings and profits were not reduced under IRC section 316(a). *Id.* at 425. The court observed: "The most that can be said about [taxpayer's] use of [the corporation] is that he used [it] as a conduit in paying subcontractors and vendors and that he obtained some limited services from corporate employees." *Id.* at 426.

Here, several facts support a finding that Plaintiffs intended to repay the costs associated with constructing their personal residence. First, Plaintiffs paid just over $20,000 from their personal bank account in 2013; no evidence was presented suggesting that they used corporate funds prior to receiving the USDA home loan. They made loan payments to the USDA from their personal bank account starting in 2014 and continuing monthly throughout subsequent years. Second, Cherry Country reported the USDA home loan separately from other loans on its balance sheet. Third, there is no evidence Plaintiffs sought to conceal the nature of the USDA home loan or mischaracterize it as a corporate expense. On the other hand, the court received no

evidence concerning Plaintiffs' ability to pay the balance of the loan. The court received no evidence of whether Cherry Country had accumulated earnings and profits, though presumably not if it has been an S Corporation since its inception.

Ultimately, Cherry Country operated more like a conduit for funds as described in *Welle*, transferring loan proceeds from the USDA to contractors. Furthermore, the court finds that Plaintiffs intended at the time of receipt to repay the construction costs by paying the home loan obligation to the USDA.

3.     *Assumption of liability*

A distribution of property by a corporation to a shareholder is at the fair market value of the property received. IRC § 301(a), (b). The amount of the distribution shall be reduced, but not below zero, by "the amount of any liability of the corporation assumed by the shareholder in connection with the distribution, and * * * the amount of any liability to which the property received by the shareholder is subject immediately before, and immediately after, the distribution." IRC § 301(b)(2)(A), (B). "For the purpose of section 301, no reduction shall be made for the amount of any liability, unless the liability is assumed by the shareholder within the meaning of section 357(d)." Treas Reg § 1.301-1(g)(1). IRC section 357(d)(1)(A) provides that "a recourse liability (or portion thereof) shall be treated as having been assumed if, as determined on the basis of all facts and circumstances, the transferee has agreed to, and is expected to, satisfy such liability (or portion), whether or not the transferor has been relieved of such liability[.]"

Plaintiffs monthly payments on the USDA home loan starting in 2014 support a finding that Plaintiffs assumed the liability in connection with Cherry Country's distribution of the loan proceeds to pay for Plaintiffs' personal residence. However, Plaintiffs often paid corporate expenses with personal funds and recorded those payments as contributions. No other evidence

supporting an assumption of liability — such as a note or other documentation — was presented. The evidence presented on this issue is inconclusive.

C.    *Schedule C Interest*

IRC section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." However, IRC section 163(h) generally prohibits a taxpayer other than a corporation from deducting "personal interest"; in other words, interest not attributable to business activities or investments.[18] Plaintiffs' interest on the Citizen's Bank line of credit was used for mixed personal and business purposes. Completing site improvements on the farm property necessary to place the manufactured home constitutes a personal expense. The court agrees with Defendant that Plaintiffs should have allocated the interest between personal and business uses. Absent any evidence to make such an allocation, the court finds Defendant's disallowance of the interest expense for 2014 and 2015 should be upheld.

## III. CONCLUSION

Upon careful consideration, the court concludes that Plaintiffs failed to meet their burden of proof with respect to suspended losses incurred before 2008 and with respect to their Schedule C interest deductions. With respect to the taxable distribution in 2015, the facts presented do not fit squarely under any legal framework. The court finds that, in substance, the USDA home loan was a personal loan made to Plaintiffs with Cherry Country merely serving as a conduit for the loan proceeds. At the time Cherry Country paid the contractors, Plaintiffs intended to personally repay the construction costs and, in fact, made monthly loan payments. The court concludes that Plaintiffs did not receive a taxable distribution from Cherry Country in 2015. Now, therefore,

---

[18] This exception is, in turn, subject to another exception allowing a deduction for "qualified residence interest" on certain homes, which is not at issue here.

IT IS THE DECISION OF THIS COURT that Plaintiffs' claim of a suspended loss of $38,185 incurred before 2008 is denied.

IT IS FURTHER DECIDED that Plaintiffs' claimed interest deduction on their Schedule C is denied for the 2014 and 2015 tax year.

IT IS FURTHER DECIDED that Plaintiffs did not receive a taxable distribution from Cherry Country in 2015 based on its payments to construct a dwelling on the farm property; the USDA home loan was, in substance, a loan to Plaintiffs not to Cherry Country.

Dated this ____ day of November 2019.


ALLISON R. BOOMER
MAGISTRATE


*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Boomer and entered on November 22, 2019.*